UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-14016-CR-MOORE/LYNCH

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL RAGLAND,

Defendant.

_____/

FILED by _____ D.C.

JUL 1 6 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO SUPPRESS STATEMENTS
DATED JANUARY 14, 2009 AND MAY 1, 2009 [D.E. #186]

THIS CAUSE having come on to be heard upon the aforementioned motion and this

Court having reviewed the motion, the government's response and the Defendant's reply,

and this Court having held evidentiary hearings in this matter on June 22, 2009, July 8,

2009 and July 10, 2009, makes the following recommendations to the District Court:

1.      At the outset of the hearing, counsel for the government requested that the

Court bifurcate the hearing since Agent Jester would not be available to testify at the

hearing on June 22, 2009. This Court agreed to conduct the continuation of the evidentiary

hearing on July 8, 2009. As is indicated later herein, this Court allowed limited testimony

DUSM Pickering on July 10, 2009.

2.      Counsel for the government called as its first witness Detective Gerwan of

the Stuart Police Department. Detective Gerwan participated in the taking of a statement

from the Defendant along with Agent Jester of the Florida Department of Law Enforcement

(FDLE) on or about January 14, 2009 at the state prison in Pennsylvania where the

Defendant was being housed pursuant to a sentence imposed upon him for criminal

conduct in that state. Detective Gerwan and Agent Jester were present at all times during

the taking of the statement. In other words, at no time during the taking of the statement

from the Defendant on January 14, 2009 were Agent Jester or Detective Gerwan alone in the room with the Defendant.

3.      The Defendant was read his Miranda rights from a written form.  That form was introduced into evidence as Government's Exhibit No. 1 for the purpose of this hearing.  The Defendant told Detective Gerwan and Agent Jester that he understood his rights and agreed to speak with them.  The Defendant executed the written Miranda waiver, Government's Exhibit No. 1, according to Detective Gerwan.

4.      The Defendant's statement was recorded and transcribed.  Detective Gerwan has reviewed the written transcript, but has not reviewed the compact disc containing the oral record of the Defendant's interview with the agents.

5.      Detective Gerwan stated that he and Agent Jester identified themselves to the Defendant when they first met him at the prison facility in Pennsylvania.  They informed the Defendant that they were law enforcement officers from South Florida and wanted to talk with him about some crimes that they were investigating in the South Florida area. This is when the Miranda form was read to him and the tape of the interview was started.

6.      The tape was turned off for bathroom breaks and for getting the Defendant something to eat and drink.  Also, at the beginning of the interview, apparently the Defendant wanted the tape turned off so he could think about what he wanted to do.

7.      No promises or threats were made to the Defendant.  Detective Gerwan testified that the Defendant affirmed this on the tape.  The agents did mention to the Defendant that they would vouch to a Judge and/or a Magistrate that the Defendant had cooperated and was truthful, if he decided to speak with them about the crimes they were investigating.  No other promises or assurances were made according to Detective Gerwan.

8.     Government's Exhibit No. 4 is an FDLE consent form signed by the Defendant during the interview which permitted the taking of DNA samples from him and photographing of the Defendant. That exhibit was admitted into evidence at the hearing.

9.     Government's Exhibit No. 5 is a still photograph taken from surveillance of the robbery of A&M Discount Beverage in Jupiter, which is one of the indicted offenses in this case. The writing and date on the bottom of Government's Exhibit No. 5 is the Defendant's signature and date as testified to by Detective Gerwan. Detective Gerwan testified that by signing and dating the photograph, the Defendant was told that he was acknowledging that he was the person in that photograph at the robbery of that convenience store.

10.    Detective Gerwan testified that he was investigating four possible robberies in his jurisdiction. There was a robbery at a Circle-K store in which the Defendant was not implicated. There was a robbery at a Riteway store where the Defendant was not implicated because there was no video. There was a second robbery at a Riteway store on Palm Beach Road in Martin County, Florida, for which the Defendant is indicted in this case. There was also a Shell station robbery for which the Defendant is indicted as well.

11.    Apparently DNA on clothing left during the Shell station robbery came back in December 2008 or the first part of January 2009 with a "hit" linking the DNA on that clothing to this Defendant.

12.    There were apparently several robberies involved in various law enforcement jurisdictions in this area which were taking place at or about the same time. In speaking with other law enforcement agencies, the law enforcement officials assigned to those various robberies believed that these robberies were being committed by the same individuals. Meetings were held with representatives of these other local law enforcement agencies to coordinate efforts.

3

13.     At the time of the interview on January 14, 2009, Detective Gerwan did not know anything about the educational background of the Defendant. He did know the Defendant's criminal history. He could not testify as to whether or not the Defendant had ever been read Miranda during any of his prior arrests for charges which are unrelated to those in the indictment in this case.

14.     The first part of the interview took approximately an hour and one-half. The testimony was that the interview started at or about 10:41 a.m. and concluded at or about 12:14 p.m. The Defendant denied any involvement about any of the robberies in Florida during this first part of his interview with the agents. The Defendant said that he really could not help them with anyone who had committed these robberies in Florida. However, Detective Gerwan was careful to state that at no time did the Defendant ever say that he wanted a lawyer, that he wanted to stop talking, or that he wanted the agents to stop their interview and leave. To Detective Gerwan, the Defendant seemed to be "fishing" to see what information the agents had before he decided whether or not he was going to actually cooperate and provide information concerning their investigation.

15.     On cross-examination, counsel for the Defendant went into various portions of the transcript which encompassed this first part of the interview. Apparently up to approximately page 106 is considered to be the first part of the interview with the Defendant. These portions of the transcript referred to by counsel for the Defendant on cross-examination appear to be for the intended purpose of showing the Defendant told the agents he had nothing to tell them about these robberies. Once again, it was clear though in Detective Gerwan's testimony that at no time did the Defendant unequivocally state that he wanted to stop talking, wanted a lawyer, or wanted the agents to leave.

16.     Prior to the interview with the Defendant, Detective Gerwan and Agent Jester had already spoken to an individual named Amber Gehret, who is the Defendant's

4

girlfriend/fiancee. Ms. Gehret was implicated in some of these robberies. She purportedly told the agents to tell the Defendant to "tighten up" and that she was alright. The agents told the Defendant that Ms. Gehret was cooperating and she wanted him to cooperate. Detective Gerwan admitted that it was the agents' intent to let the Defendant know that his girlfriend/fiancee was cooperating, was alright, and that she wanted him to cooperate as well.

17.    At one point during the interview, the Defendant said words to the effect that the agents were "dropping a bomb" on him to indicate that they were presenting him with a great deal of information about crimes and he needed time to think. Detective Gerwan is of the opinion that the Defendant was still trying to figure out what the agents had on him and that he was overwhelmed with all of the information that was being presented to him concerning these robberies in South Florida.

18.    Another excerpt on page 37 of the transcript was referred to by counsel for the Defendant at the hearing wherein the Defendant purportedly says that he would never take other people down with him. Another reference around page 56 of the transcript again reflects the Defendant saying that he was not going to take anyone else with him and if he did something he would accept that. Detective Gerwan believed that the Defendant was still "fishing" to see what information the agents actually had on him concerning these crimes. The Defendant never at any time indicated his unwillingness to keep communicating with the agents during this interview.

19.    During the investigation, the violence involved in the robberies appeared to escalate. The agents began mentioning to the Defendant that the robberies had been getting more violent and asked him how he would feel if someone ended up getting killed during one of the robberies. Detective Gerwan stated that the agents were trying to get the Defendant to cooperate and give him time to think about these things.

20. There was some discussion about the State of Florida law referred to as "10-20-Life." Detective Gerwan testified that it looked to him as though the Defendant was looking for a 20 year sentence commitment after he and the agents began discussing the "10-20-Life" law. Detective Gerwan testified that the agents told the Defendant that they did not know if the case was going to be prosecuted by state authorities or federal authorities. Agent Jester, as an interview technique, said that he would pick up the phone immediately and call the prosecutor to get the Defendant's questions answered. Detective Gerwan has no idea who Agent Jester was intending to call and no call was made.

21. As stated above, what is being referred to during this hearing as the "first part of the interview" ends at around page 106 of the transcript which was marked for identification purposes only as Government's Exhibit No. 3. This exhibit was not yet admitted into evidence until such time as the testimony of Agent Jester could be secured at the continuation of the evidentiary hearing on July 8, 2009.

22. On cross-examination, counsel for the Defendant pointed out that up to about page 103 of the interview transcript the Defendant still appears to be saying that he could not help the agents. Detective Gerwan made it clear in his testimony that while the Defendant may have kept saying that he could not help the agents with their investigation, at no time did he ask them to leave, request an attorney, or tell them that he did not want wish to speak any further.

23. Detective Gerwan testified that the Defendant appeared to be "hung up" on the length of sentence he may receive. Detective Gerwan told the Defendant that, for example, he has seen persons commit a crime calling for a sixty year sentence and see that person only get six or seven years later at sentencing. Detective Gerwan said he has actually seen this during his law enforcement career and was not making this up simply to get the Defendant to cooperate. He admitted that he was stating this to the Defendant to

6

try to explain that the Defendant should not get "hung up" on the twenty year sentence that was being discussed. This apparently is at or about the time when the agents said that they would vouch for him and tell any judge that the Defendant had been truthful and cooperated.

24.     Detective Gerwan was not involved in the statement taken from the Defendant on May 1, 2009 and therefore his testimony does not reflect anything concerning that later statement which was addressed by Agent Jester as part of the continuation of this evidentiary hearing.

25.     On re-direct examination, Detective Gerwan testified that the atmosphere in the room during this interview of the Defendant was calm and relaxed. It was "more of a give-and-take with the Defendant" than a confrontational interview. He testified that the agents were not trying to trick the Defendant. At no time did the Defendant request a lawyer, request to stop talking, or request the agents to leave the room and stop the interview.

26.     The Defendant did ask the agents what "they had on him" and whether or not the gun involved in the robberies had any fingerprints on it. He also asked what witnesses were against him and if Florida was a commonwealth state. Detective Gerwan again was clear to state that at no time did he nor Agent Jester promise the Defendant a specific length of sentence of any type. They simply answered the Defendant's questions concerning sentences he might receive.

27.     At the point in the interview when the agents were telling the Defendant that the violence involved seemed to be escalating in these later robberies, the Defendant stated that he understood how a victim of a crime of violence feels. Apparently the Defendant has taken a crime victimization course in prison and told the agents that he now knows the impact that such a crime can have on a victim. Detective Gerwan testified that

7

a victim in one of the robberies indicted in this case has been so affected that she cannot go back into a convenience store. In regards to the possible escalation of violence involved in these robberies, the agents told the Defendant that if he "gave up" his co-defendants who were committing these robberies, that the Defendant could possibly prevent someone being injured in a future robbery.

28.     Counsel for the government pointed out at or about page 84 of the interview transcript that the Defendant said that God has a plan and that if he is guilty then he is guilty. Detective Gerwan stated that this appeared to show that the Defendant's demeanor had changed from his outright denial of involvement at the beginning of the interview. The Defendant again talked about the victimization class that he had taken since he was in custody. When asked if the Defendant was cooperative once he agreed to provide information, Detective Gerwan said that the Defendant was cooperative. Further, the Defendant told the agents that he has had some college education.

29.     In regards to execution of the DNA consent form, Government's Exhibit No. 4 in evidence, this was presented to the Defendant by Agent Jester. Agent Jester asked the Defendant that if he could show the Defendant some concrete evidence, would that lead the Defendant to cooperate. The Defendant said yes. Therefore, Agent Jester asked the Defendant to sign the DNA consent form which would permit them to obtain DNA and attempt to link it to the clothing involved. As referenced above, it is this Court's understanding that the clothing had already been linked to the Defendant's DNA in this case.

30.     Since the Defendant has some college education, Detective Gerwan found the Defendant able to read, write and understand English well. The Defendant had no inabilities in understanding the questions and answers during the interview. The Defendant

8

had no problem signing his name or reading any of the forms which were executed by the Defendant.

31.     Since this hearing was being bifurcated at the government's request, the Defendant asked if he could present a witness in attendance at the hearing out of order before the government concluded its presentation. The witness present was the Records Custodian for the Palm Beach County Sheriff's Office. The Court allowed the Defendant to call this witness out of order even though it was not yet time for the Defendant to present his case.

32.     The Records Custodian is Richard Kuntemeier. He is the Inmate Records Unit Supervisor for the Palm Beach County Sheriff's Office. The government and the Defendant stipulated to the entry of Defendant's Composite Exhibit No. 1 into evidence. Therefore, it was not necessary to have Mr. Kuntemeier testify. The stipulation was that the records attached to Defendant's Composite Exhibit No. 1 are true and accurate records in the Palm Beach County Sheriff's Office which reflect that the Defendant was booked into the Palm Beach County Jail by the United States Marshal's Service on April 29, 2009 at approximately 1519 military time. The Defendant remained there until he was released to the United States Marshal's Service on May 5, 2009 at approximately 10:04 a.m.

33.     After the conclusion of the hearing, this Court did review Defendant's Composite Exhibit No. 1. It reflects a "date of arrest" on the "federal prisoner rough arrest" sheet noting a date and time of arrest of the Defendant of April 29, 2009, at 12:00 p.m. The exhibit then reflects the booking time of 1519 that same afternoon.

### Continuation of Hearing on Defendant's Motion To Suppress on July 8, 2009

34.     At the continuation of this hearing, the government called Agent Jester of the Florida Department of Law Enforcement to testify. Agent Jester obtained the taped

9

statement from the Defendant on January 14, 2009 at the Mercer State Correctional Institution in Mercer, Pennsylvania. The Defendant was serving a state sentence in the State of Pennsylvania pursuant to a conviction in that state.

35.     Agent Jester identified the Defendant in court as the same individual from whom he took the taped statement on January 14, 2009. Accompanying Agent Jester at the time of the interview of the Defendant was Detective Gerwan as well as a Corrections Officer from the State of Pennsylvania facility where the Defendant was being housed and questioned.

36.     At all times during the taking of the Defendant's statement on January 14, 2009, both Agent Jester and Detective Gerwan were present in the room together with the Defendant. At no time was either Agent Jester or Detective Gerwan alone with the Defendant.

37.     Prior to beginning the interview, Agent Jester believes that he read the Defendant his Miranda rights from a form which has been introduced into evidence as Government's Exhibit No. 1. He also remembers giving this form to the Defendant to read. The Defendant stated to Agent Jester that he understood his rights and signed the form, Government's Exhibit No. 1.

38.     The statement was recorded and transcribed. Agent Jester has reviewed the transcript of the statement (Government's Exhibit No. 3) and has at the same time listened to the compact disc containing the Defendant's statement (Government's Exhibit No. 2). Agent Jester testified that the transcript accurately reflects the oral statement as recorded on the compact disc. The government moved each of these exhibits into evidence. The Defendant had no objection. Therefore, Government's Exhibit No. 2, being the compact disc of the Defendant's statement, and Government's Exhibit No. 3, being the transcript of that compact disc, were admitted into evidence.

39.     Agent Jester explained to the Defendant where he and Detective Gerwan were from and why they were there.  He also told the Defendant that they would be recording the statement.  It was then that the tape recording equipment was turned on. The advice of Miranda was done prior to the tape recording being turned on.  However, once the recording was started, Agent Jester then reviewed with the Defendant on the record that he had been advised of his Miranda rights and had executed the form, Government's Exhibit No. 1 in evidence.

40.     The interview then continued. This Court will not go into the substance of the January 14, 2009 interview of the Defendant at this time. The Court will address the interview those items of evidence separately later herein.

41.     Agent Jester testified that they did stop the tape for a break during the interview.  They took the break because the Defendant wanted time to think and all of the individuals in the room needed a break.  Agent Jester testified that no promises or threats were made off the record while the recording equipment was turned off.  He testified that this was also affirmed by the Defendant once the recording equipment was turned on again after the break concluded.

42.     There was a second break taken so that Agent Jester could start his laptop to show the Defendant some surveillance video from some of the robberies.  At that time Detective Gerwan got the Defendant some food since he had missed his meal during the interview.  Once again, Agent Jester testified that no promises or threats were made while the recording equipment was turned off and this was once again affirmed on the record once the recording was turned on again.

43.     At no time did the Defendant ever say that he wanted an attorney or to stop talking.  Agent Jester testified that four to five times at the beginning of the interview the

11

Defendant said that he really could not help them because he did not want to give up anyone else or implicate anyone else in these robberies.

44.     Agent Jester testified that he did tell the Defendant that if he cooperated, he could be saving lives because the violence in the robberies which were still occurring in this area had escalated.  Apparently one victim had been pistol-whipped during a robbery and this information was provided to the Defendant so he would understand that his cooperation could possibly be instrumental in stopping future robberies from occurring.

45.     Government's Exhibit No. 4 already in evidence is a Consent Form which was obtained by Agent Jester from the Defendant to allow obtaining DNA swabs as well as photographs of the Defendant and the Defendant's tattoos.  Agent Jester identified that exhibit at the hearing.  Government's Exhibit No. 5 already in evidence is a photograph of the Defendant purportedly committing the robbery at the A&M Discount Beverage store. Agent Jester testified that the Defendant's signature appears on Exhibit No. 5 and was placed there to reflect the Defendant's admission that he was the person depicted in the photo.

46.     Agent Jester was not involved in the transfer of the Defendant from Pennsylvania to Florida for his court appearances in this case.  After Agent Jester was advised that the Defendant arrived at the Palm Beach County Jail, he and AUSA Talwar and AUSA Lineberger went to that facility for a second interview of the Defendant.  The reason given by Agent Jester was that since his interview of the Defendant on January 14, 2009 in Pennsylvania,  other facts had come to light from alleged co-defendants named in this Indictment or from other sources.  For example, there was a photograph of a BP station robbery in Fort Pierce, Florida, which was not in Agent Jester's possession during the January 2009 interview. He wished to clear up some of these matters with a followup interview of the Defendant at the Palm Beach County Jail on May 1, 2009.

47.     Agent Jester initially met with the Defendant alone at the Palm Beach County Jail and told the Defendant he was there to clear up and pursue other facts that had come to light since their last interview. It is apparent that Agent Jester did not have any contact with the Defendant between January 14, 2009 and May 1, 2009. Agent Jester told the Defendant that there were two Assistant United States Attorneys involved with the prosecution who were also at the jail. He advised the Defendant that the AUSAs could answer the Defendant's questions regarding the charges he was facing.

48.     It appears as though AUSA Talwar and AUSA Lineberger were then brought into the room. The Defendant was read his Miranda rights from a card which Agent Jester carries. He testified at the hearing that he has the same card in his possession and read from it into the record at this hearing. The rights he read into the record appear to comply with the requirements of Miranda. Agent Jester testified that the Defendant stated he understood his rights and waived those rights. The Defendant indicated he was willing to talk with Agent Jester as well as AUSA Talwar and AUSA Lineberger. Agent Jester testified that the Defendant was cooperative. The summary of the Defendant's statement given during the May 1, 2009 interview is as set forth in Agent Jester's report. Later in this hearing, the Defendant moved to admit Agent Jester's report into evidence as Defendant's Exhibit No. 2. There was no objection from the government and the report was admitted into evidence.

49.     On cross-examination Agent Jester testified that prior to the January 14, 2009 interview he explained to the Defendant each of his rights from the Miranda form, Government's Exhibit No. 1. Further, he advised the Defendant that he was investigating crimes committed in Florida. He is not sure if he said "crimes" or "robberies." However, Agent Jester testified that he clearly explained to the Defendant that they were there investigating criminal matters from Florida.

13

50.     After the January 14, 2009 statement, the case was presented to the United States Attorney's Office for prosecution.  Agent Jester was not sure exactly when this took place, but it possibly was in February of 2009.  He knew that the Defendant would have to be brought to the State of Florida to face these charges.  He advised someone at the United States Attorney's Office, either AUSA Acosta or AUSA Talwar, that he would be willing to go to Pennsylvania to transport the Defendant back under State procedures.  However, he was told that since this was a Federal case, the United States Marshal's Service would be in charge of arresting and transporting the Defendant.  Further, Agent Jester testified that the Warden at the Mercer State Correctional Institution in Pennsylvania advised him that a Federal Marshal would have to be the one who takes custody of the Defendant pursuant to a warrant.  Therefore, Agent Jester testified that he was not involved in how or when the Defendant would be brought back to the State of Florida.

51.     Counsel for the Defendant showed Agent Jester the Writ of Habeas Corpus Ad Prosequendum signed by this Court to bring the Defendant here.  He testified that this was at or about the time when he told the representatives of the United States Attorney's Office that he would be willing transport the Defendant back to Florida and was told that the United States Marshal's Service would be in charge of the transportation of the Defendant.

52.     The next time that Agent Jester was aware that the Defendant was in Florida was approximately April 30, 2009, or one day prior to his going to take the followup statement from the Defendant at the Palm Beach County Jail.  He believes that he was informed by Deputy U. S. Marshal Jay Karlovitch that the Defendant was in this District.  This was pursuant an inquiry made by Agent Jester as to when the Defendant may be brought back.  Agent Jester testified that to the best of his recollection this was about the same time when the United States Attorney's Office became aware that the Defendant was

14

in the Southern District of Florida in the custody of the United States Marshal's Service. It was also at this time that Agent Jester became aware of the date set by this Court for the Defendant's initial appearance on May 6, 2009 as is set forth in the Order granting the government's Motion To Continue Defendant's Initial Appearance.

53.     On further cross-examination, Agent Jester testified that he never discussed with anybody bringing the Defendant to his initial appearance since he was informed that he was not involved in any of those transportation issues for the Defendant and that the date had already been set for the Defendant's initial appearance which was to be May 6, 2009, as set by this Court's Order granting the government's Motion To Continue Defendant's Initial Appearance.

54.     Agent Jester testified that he wished to take a second statement from the Defendant on May 1, 2009 because of additional information that had come to light since he had last spoken with the Defendant in Pennsylvania on January 14, 2009. He testified the Defendant had been cooperative during that previous statement and now Agent Jester had a photo of the BP station robbery. He wanted to see if the Defendant would identify himself as being the person in that photograph or identify someone else from that photograph. Further, one of the individuals questioned in this case concerning these robberies is a Ms. Gehret. There had been one interview on January 13, 2009 of Ms. Gehret and then there were followup interviews with her subsequent to the January 14, 2009 of the Defendant. Therefore, Agent Jester wanted to clarify some of the information obtained in the subsequent statements and review those with the Defendant. During cross-examination counsel for the Defendant referred to these "clarifications" as "inconsistencies." Nevertheless, whether they were referred to as "clarifications" or "inconsistencies" it is clear why Agent Jester went to meet with the Defendant on May 1, 2009.

55. During the May 1, 2009 statement, there were no specific questions concerning getting the Defendant an attorney aside from what is contained within the advice of his constitutional right pursuant to the Miranda decision as read to the Defendant from the card Agent Jester carries. At no time did the Defendant ask for an attorney. The statement was not recorded. There was no discussion with any representative of the United States Attorney's Office about getting the Defendant an attorney before speaking with him again. Finally, Agent Jester has reviewed his report and it accurately represents the facts obtained from the Defendant during the May 1, 2009 statement. Once again, that document has been admitted into evidence as Defendant's Exhibit No. 2.

56. On re-direct, Agent Jester testified that at no time did the Defendant indicate that he could not read or write when he was first interviewed on January 14, 2009. In fact, the Defendant stated that he had taken some college courses and appeared to be able to review Government's Exhibit No. 1, being advice of constitutional rights and sign the document as is indicated on the exhibit.

57. In respect to the May 1, 2009 statement, Agent Jester confirmed that he had read the Defendant his rights from the Miranda card which was the same one that Agent Jester produced at the hearing and read into the record. He recalls questioning the Defendant after each right to make sure that the Defendant understood. The Defendant stated that he did understand those rights, waived his rights and agreed to speak with Agent Jester as well as AUSA Talwar and AUSA Lineberger.

58. When asked by AUSA Talwar as to why the statement was not recorded, Agent Jester stated that he does not record all statements. This is not the first time that he has decided to not record a statement. No further reason was given.

59. After both counsel indicated that they had no further questions of Agent Jester, this Court required clarification of a couple of issues and asked Agent Jester

16

specific questions. In response to this Court's questions, Agent Jester testified that at no time were any promises or threats made by anyone in respect to the May 1, 2009 statement from the Defendant. The Defendant never indicated that he wanted to stop talking until the very end. Once the Defendant said that he was finished talking, the interview concluded. Finally, the Defendant never requested an attorney or to consult with an attorney at any time prior to or during the May 1, 2009 statement.

60. It was at this point that AUSA Talwar sought to introduce a copy of the Writ issued by this Court setting the Defendant's initial appearance for April 23, 2009 as well as other documents concerning the continuation of the initial appearance originally set by this Court pursuant to the original Writ. Mr. Patanzo objected on behalf of the Defendant and said this is exactly why he filed his motion to obtain the testimony of the United States Marshal's Service (DE #199) concerning the transport of the Defendant, which has been denied by this Court's Order of June 19, 2009.

61. This Court stated that while it did not have the motion or its Order before it during this hearing, that this Court recalls that Mr. Patanzo's requests were very general in nature seeking any and all documentation and information concerning transport of the Defendant and extradition proceedings in general. This Court stated that it believed that those general areas of inquiry were rightfully objected to by the government and that it was not this Court's obligation to narrow the area of inquiry that the Defendant wished concerning examination of a representative from the United States Marshal's Service.

62. This Court did state at the hearing that Mr. Patanzo should have the right to make a limited inquiry concerning why the Defendant may not have been able to be brought to the Southern District of Florida pursuant to this Court's Writ which then required the government to file a motion to continue the Defendant's initial appearance and issue its Order granting the Motion To Continue Defendant's Initial Appearance. This Court

stated on the record that as long as the narrow inquiry would not go into or touch on security matters which the United States Marshal's Service feels would jeopardize their method of transporting prisoners, this Court would permit such an inquiry since the government was seeking to introduce documents purportedly explaining why the Defendant was not brought into the District in time for his initial appearance on April 23, 2009 as directed by this Court's Writ. Pursuant to this request by Mr. Patanzo, this Court stated that it would allow Mr. Patanzo to question the representative from the United States Marshal's Service and set the conclusion of this hearing to be held on Friday, July 10, 2009.

63.      The hearing continued on July 8, 2009 with counsel for the Defendant calling the Defendant Michael Ragland as a witness. He testified that he is the Defendant in this case. He is now being housed at the St. Lucie County Jail. He was arrested in Pennsylvania in February 2008 on robbery charges purportedly committed in that state. He pled guilty in July of 2008 and was sentenced to a maximum of ten years in the state prison system in Pennsylvania. He is presently serving that sentence.

64.      The Defendant recalls that the first time that he knew that he was being moved to Florida was April 6, 2009 when he was told by correctional officers in Pennsylvania that he would be moved. The next day, April 7, 2009, he was taken from the Mercer State Correctional Institution to a state facility in Pittsburgh, Pennsylvania. He was not told why he was being moved. He was there unit until the next day, April 8, 2009.

65.      On April 8, 2009, two Deputy United States Marshals picked him up and took him to a Marshal's holding facility in Pittsburgh. He was then taken to a Youngstown, Ohio, facility and was there for six days. The Defendant testified that he was not told why he was being moved.

66.     On April 14, 2009, the Defendant was moved from Ohio and flown to Oklahoma City where he was held in a federal facility until April 28, 2009. He asked why he was being moved and no one had any answers for him. At no time during this transportation did the Defendant appear before any judge, whether it be state or federal, nor was he advised of any rights to have a lawyer present.

67.     On April 28, 2009, the Defendant was flown by the United States Marshal's Service to FDC, Miami, Florida. On April 29, 2009, he was transported by United States Marshals to the Palm Beach County Jail on Gun Club Road. Once again he had not had an initial appearance or advised why he was in the State of Florida.

68.     On May 5, 2009, he was driven to the St. Lucie County Jail and appeared before this Court for his initial appearance on May 6, 2009, in respect to these charges.

69.     In regards to the statement taken from him on May 1, 2009, he recalls Agent Jester and two Assistant United States Attorneys meeting with him at the Palm Beach County Jail. He was told by the jail staff that he had a visitor, but he did not know who it was. Agent Jester said that he wanted to talk alone with the Defendant and the two Assistant United States Attorneys left the room.

70.     Agent Jester told him that he had additional information that he wanted to review with the Defendant. The Defendant asked Agent Jester what "type of jail time" he was facing. Agent Jester would not say anything specific except that he was "looking at a lot of time." He recalls giving Agent Jester examples of years such as more than ten, more than fifteen, or more than twenty, and recalls Agent Jester saying more than twenty.

71.     Agent Jester told the Defendant that he could help himself and promised leniency. Approximately ten minutes later the two Assistant United States Attorneys came back into the room. The Defendant agrees that no promises or specific number of years were mentioned. The Defendant was told that if he cooperated that he could help himself.

19

72.    He recalls AUSA Talwar introducing herself as the prosecutor assigned to this case. She mentioned that co-defendants Mitchell and James were going to trial in this case and asked the Defendant if he would testify against them. AUSA Talwar said that the Defendant could help himself and was facing a lot of time.

73.    On cross-examination, AUSA Talwar asked the Defendant if he had attended college. The Defendant said he has taken some college courses and is 20 years old.

74.    In respect to the January 14, 2009 statement, the Defendant said that the agents told him they were from Florida and was asked about several robberies in Florida. Based upon this, he admitted on cross-examination that he knew he was facing charges in Florida.

75.    Prior to being taken into United States Marshal's custody in Pittsburgh, the Defendant did undergo some medical tests which would have been on or about April 8, 2009 as indicated by the Defendant's recitation of his travel itinerary previously herein. The Defendant also admitted on cross-examination that he had an idea why he was being taken back to Florida.

76.    This Court should point out for the record that while the Defendant was on the stand, this Court advised the Defendant of his constitutional rights to remain silent and advised the Defendant that a record was being made. This Court further advised the Defendant that anything he said at this hearing could be used against him. This Court further advised the Defendant that he had the right to refuse to answer any questions that AUSA Talwar asked him, any questions that his own attorney may ask him, and any questions that this Court may ask him. Further, this Court advised the Defendant that he did not have to give a reason for refusing to answer any question he so chose to refuse to answer. The Defendant responded to each of these statements by the Court and said he understood his rights in this regard. This Court decided to advise the Defendant of his

rights during his testimony since it appeared as though certain questions were going into areas wherein the Defendant may be asked to admit his involvement in the underlying crimes charged in this Indictment. At certain points the Defendant simply refused to answer some questions and no further inquiry into those areas was permitted by the Court.

77. The Defendant admitted that neither Agent Jester, AUSA Talwar nor AUSA Lineberger ever gave a specific number of years in prison that the Defendant was facing. They simply said that he was facing a lot of time.

78. The Defendant admitted that Agent Jester did read his Miranda rights from a card. However, the Defendant denies that Agent Jester asked if he understood his rights after each particular right was read to him. The Defendant was equivocal in his testimony and said that he "might have said" that he understood his rights when asked at the conclusion of the Miranda advice by Agent Jester on May 1, 2009. The Defendant testified that he was "in a state of confusion" and never had been taken before a judge or seen a lawyer. He believes he said during the statement that "he was confused" but does not recall whether or not he specifically said that to anyone during the May 1, 2009 statement.

79. The Defendant testified that he does not recall saying he understood his rights. The Court notes that the Defendant at one point during the hearing testified under oath that he may have "generally" said he understood his rights and then later unequivocally testified that he never said he understood his rights. This was an inconsistency in the Defendant's testimony and needs to be mentioned at this point. This Court needs to note for the record that when the Defendant seemed to give an inconsistent answer to a question on cross examination, he would return to his general response that he was confused at the time of the May 1, 2009 interview.

80. The Defendant testified that he told the agents and Assistant United States Attorneys that he would not testify against any co-defendants. This apparently is the same

as he stated during the January 14, 2009 interview.  Once again, the Defendant at this point testified that he was in a "state of confusion" because he had not heard from anyone or seen anyone regarding these charges since Agent Jester's interview of him on January 14, 2009 in Pennsylvania.  He was again equivocal as to whether or not he specifically recalled telling anybody during the May 1, 2009 interview that he was "confused."

81.     The government called Agent Jester in rebuttal.  He was called out of order since this Court permitted the Defendant to question a representative of the United States Marshal's Service at the conclusion of this hearing on July 10, 2009, within the narrow parameters set by this Court on the record.  On rebuttal, Agent Jester testified that during the January 14, 2009 interview, the Defendant was told that he would be prosecuted either by the State Attorney's Office in Florida or by the United States Attorney's Office in Florida for the robberies which were being investigated in this area.  It was at this time that the Defendant asked Agent Jester what kind of "time he would get."  He also asked Agent Jester if any prison time he received in regards to these cases would be consecutive or concurrent to the time that he is serving on the Pennsylvania conviction.  Agent Jester told the Defendant that he had no idea how any prison time would be calculated or served.

82.     During the May 1, 2009 interview at the Palm Beach County Jail, when the Defendant first saw Agent Jester he grinned.  When he and the Defendant were alone, the Defendant once again asked what kind of prison time he was facing.  Agent Jester said that he told the Defendant that is why the Assistant United States Attorneys were there and could answer his specific questions.  Agent Jester said that he could not give any specific answers to the Defendant about any prison time.  It was at this time that the Defendant asked if he was looking at more than twenty years and all Agent Jester said was that he was "looking at a lot of time."

22

83.     After AUSA Talwar and AUSA Lineberger entered the room, Agent Jester introduced them to the Defendant. Before any questioning, AUSA Talwar told the witness to read the Defendant his Miranda rights. This was done from the card carried by Agent Jester as previously recited during his testimony on direct examination. Agent Jester recalls the Defendant specifically stating that he understood his rights and agreed to speak with them.

84.     At no time did the Defendant ever say that he was confused in any fashion nor did he say he was confused in response to any specific question except to possibly rephrasing a question. The Defendant never stated that he was confused as to why he was there, why they were speaking with him, or what was taking place.

85.     When the Defendant was asked if he would testify against co-defendants, the Defendant stated that he would not do so. The Defendant stated that he would just do his jail time and would not take anyone else with him.

86.     When the Defendant indicated that he wanted to stop talking, the interview ended. Towards the end of the interview when the Defendant asked AUSA Talwar how many years of prison time he was looking at, Agent Jester recalls AUSA Talwar saying "upwards of 200 years."

### Continuation of Hearing on Defendant's Motion To Suppress on July 10, 2009

87.     On Friday, July 10, 2009, this Court conducted the conclusion of the evidentiary hearing on the Defendant's Motion to Suppress. At the outset of the hearing, the government offered Government's Exhibit No. 6 into evidence. This is composite exhibit containing certain documentation involving the Defendant's transport by the United States Marshal's Service (USMS) back to the Southern District of Florida. The documents within Government's Exhibit No. 6, which was admitted into evidence without objection, are

23

this Court's Writ of March 17, 2009 directing the Defendant to be taken into custody and brought before this Court on April 23, 2009 for his initial appearance at the U. S. District Courthouse in Fort Pierce. The next document within this exhibit is a fax cover sheet from the Mercer State Correctional Institution in Pennsylvania advising that the Defendant would be ready to be picked up from their facility on April 8, 2009. The next document within this exhibit is a U. S. Marshal's Service is a prisoner tracking form reflecting where the Defendant was transported and brought back to the Southern District of Florida. The next document within Government's Exhibit No. 6 is a form utilized by the USMS notifying that the Defendant is ready for movement and where the Defendant will be moved, and it is also marked to "expedite." The next form reflects that the Defendant was received in this District on April 28, 2009. The last two pages of this exhibit appear to be identical according to the testimony received by the Court and reflect when and where the Defendant was transported from Mercer in the Western District of Pennsylvania.

88.    Originally, the government had a medical exam form attached to Government's Exhibit No. 6 as well. The Defendant objected to that because it contained personal medical information. Based upon that, the government made a proffer that on April 3, 2009 the Defendant received a medical clearance from the State prison in Pennsylvania indicating that the Defendant would be available no earlier than April 8, 2009 to be taken into custody by the United States Marshal's Service at Pittsburgh. The Defendant agreed to this proffer. Based upon the Defendant's agreement, this Court directed the government to delete the medical information form from the exhibit. It was done so and Government's Exhibit No. 6 was admitted into evidence without further objection.

89.    The government next called Deputy United States Marshal Wayne Pickering. He has been with the United States Marshal's Service twenty-three years. At no time did

24

he ever discuss anything concerning the Defendant's transportation with AUSA . Talwar. It was only after he received a subpoena from Mr. Patanzo for certain documents did he discuss this case with Ms. Talwar. DUSM Pickering then testified and explained each document contained within Government's Exhibit No. 6 which this Court has referenced above.

90.     On cross-examination, DUSM Pickering testified that the procedure utilized by the USMS for transport of a prisoner in custody out of state is to notify the out of state facility, as was done in this case, and advise the facility that a Writ of Habeas Corpus Ad Prosequendum has been issued requiring the appearance of one of their in-custody prisoners. The prisoner must have medical clearance through that other facility before the USMS will take him into custody. Notice was so given to Mercer State Correctional Institution in Pennsylvania where the Defendant was serving a sentence. DUSM Pickering testified this was probably done by telephone and there is no documentation of that notice. He testified that Mercer State Correctional Institution was notified prior to April 3rd because the medical form utilized by the USMS was faxed to them on or about that date.

91.     After reviewing the medical information form, Mr. Patanzo on behalf of the Defendant, agreed that on or about March 24, 2009, a medical form was faxed by the USMS to Mercer State Correctional Institution in Pennsylvania. It was then that the Defendant received his medical examination and the USMS was advised that he would be available for pick up at Pittsburgh sometime on or after April 8, 2009.

92.     When asked why the Defendant was not transported directly to the Southern District of Florida, DUSM Pickering said that there are no direct flights to the Southern District of Florida. The USMS has a holding facility in Oklahoma City, Oklahoma. All prisoners are flown through there. He estimated that there are 350,000 prisoners, more

or less, who are moved about the country by the USMS on an annual basis. They all go through Oklahoma City which is their "hub."

93.    DUSM Pickering testified that he had no idea why the Defendant was taken to Ohio from Pittsburgh. The Defendant was held there for the first available flight to Oklahoma City from Ohio where he was in federal custody. The first available flight was on April 14, 2009 according to information contained within Government's Exhibit No. 6.

94.    DUSM Pickering testified that he was aware that the deadline for the Defendant's initial appearance before this Court is reflected as April 28, 2009 on Form 106 contained within Government's Exhibit No. 6 even though this Court's Writ contained within Government's Exhibit No. 6 set the Defendant's initial appearance for April 23, 2009. He recalls that due to the fact that no flights were available for the Defendant from Oklahoma City to the Southern District of Florida, that an extension was sought to continue the Defendant's initial appearance and an Order was issued by this Court re-setting the Defendant's initial appearance for May 6, 2009. When asked on the record near the conclusion of this hearing, counsel for the Defendant agreed that this Court could take judicial notice of the Motion To Continue the initial appearance, the Order entered by this Court continuing said initial appearance, and the Order which re-set the Defendant's initial appearance for May 6, 2009 which is when he did appear before this Court for the first time.

95.    DUSM Pickering testified that flights were arranged for the Defendant, as they are for all prisoners, and booked only after that person is taken into federal custody. Therefore, the flights involving this Defendant getting back to the Southern District of Florida were only booked after he was taken into federal custody on April 8, 2009. This being the first date that he was available to be taken from the State of Pennsylvania authorities.

26

96.     Government's Exhibit No. 6 reflects that the Defendant left Oklahoma City on April 28, 2009 and was flown to Miami, Florida, that same day. DUSM Pickering testified that he knows that there were no flights to Miami from April 14 until April 28, 2009. He has no idea whether or not there were any flights available prior to April 14, 2009. He testified that there are no legal proceedings held at the Oklahoma City holding facility.

97.     DUSM Pickering testified that the Defendant was taken to the Palm Beach County Jail the following day, April 29, 2009. When asked on cross-examination why the Defendant was not taken to the United States District Courthouse in West Palm Beach for an initial appearance and any other court proceedings, DUSM Pickering testified that this Court had already issued an Order directing that his initial appearance be in Fort Pierce on May 6, 2009.

98.     This concluded the evidence received. When asked, the government announced that it had no further testimony or evidence. When asked, counsel for the Defendant stated that he had no further evidence or testimony to submit.

99.     This Court asked counsel for each party as to whether or not they had any additional arguments aside from those already set forth in their pleadings and papers filed herein. Both counsel for the government and counsel for the Defendant stated that they did not have any further argument to make to the Court.

100.    As part of the evidence in this case, this Court wishes to review portions of the Defendant's statement given to the agents on January 14, 2009 as well as the statement given to Agent Jester, AUSA Talwar and AUSA Lineberger on May 1, 2009.

101.    In respect to the January 14, 2009 statement, this Court has listened to the CD containing the Defendant's interview which has been admitted into evidence as Government's Exhibit No. 2 at the hearing. This Court has also read the 228 page transcript of that statement which was admitted into evidence as Government's Exhibit No.

27

3. This Court will attempt to cite the District Court to certain portions of the Defendant's January 14, 2009 statement to allow the District Court to have some sense of the tenor and content of that statement.

102.    Based upon listening to the CD and reading the transcript, this Court does not find any coercion exerted on the Defendant by either Agent Jester or Detective Gerwan. The statement appears to have been taken in a relaxed atmosphere. There were two breaks during the January 14, 2009 statement. The transcript as well as the audio CD reflect a calm conversation taking place between Agent Jester, Detective Gerwan and the Defendant. At no time did either of the agents yell, scream or threaten the Defendant. The atmosphere surrounding the interview  can be described in no other fashion by this Court other than a "relaxed conversation" in which there was a give-and-take between the agents and the Defendant.

103.    In respect to the time periods involved with the January 14, 2009 statement, the first portion of the statement began at 10:41 a.m. and concluded at 12:14 p.m. with a short break.  The Court calculates this to be approximately one hour and thirty-three minutes.

104.    There was a short break taken to allow the Defendant to smoke a cigarette and for everyone to have a bathroom break. The statement was resumed at 12:31 p.m. and continued uninterrupted to 2:07 p.m. This is approximately one hour and thirty-six minutes. A second break was taken to allow the Defendant to get some food and for Agent Jester to start his laptop computer to show the Defendant some surveillance photos or videos.

105.    The third and final portion of this statement resumed at 2:29 p.m.   It was read into the record that Detective Gerwan purchased a soda and potato chips for the Defendant since the Defendant had missed his lunch during the interview. This portion of

the interview concluded at 3:14 p.m.    This Court's calculations reflect this to be approximately forty-five minutes. Therefore, it appears that the entire time taken for the interview, excluding  the time taken for any breaks, is approximately three hours and fifty-four minutes in total.

106.   Some excerpts which this Court finds are relevant to the issues raised by the Defendant in his motion in respect to the January 14, 2009 statement are as follows:

-    Detective Gerwan is heard telling the Defendant that the worst case scenario for him would be to not cooperate because of the evidence that they have.

-    The agents told the Defendant that his fiancee Amber told him to "tighten up" and that he would know what that meant.

-    The Defendant says he "can't help you out" indicating that he did not feel that he had any information to provide the agents concerning the robberies.

-    Detective Gerwan is heard telling the Defendant that he does not have to cooperate, but there may be a day down the road where the Defendant wishes he had cooperated. Also it is re-emphasized that after speaking with the Defendant's fiancee, she purportedly wants the Defendant to cooperate.

-    Detective Gerwan tells the Defendant that he should try to help himself.

-    There is the first of many times when the Defendant indicates "you are dropping a big bomb here" or similar words to that effect which this Court will review later. Based upon the totality of listening to the statement as well as reading the transcript, this Court believes this  to mean that the Defendant was attempting to process the information which was being

presented. It is also important to note that the Defendant has taken some college classes and during the pendency of this statement even mentions to the agents that he is smarter than they probably believe he is.

-        The Defendant is again told that his fiancee Amber is in good shape.

-        Once again the Defendant says that they are "dropping a big bombshell on me right now."

-        The Defendant asks if anybody was hurt in any of the robberies.

-        The Defendant talks about having to take a Victimization Class in Pennsylvania after his conviction there and that he now knows what victims go through in robberies such as this.

-        Again the Defendant talks about the agents dropping a bombshell.

-        Detective Gerwan asks the Defendant "Do you want to help yourself out?"

-        Once again the Defendant refers to the agents dropping a bombshell on a couple of different occasions in this area of the statement.

-        The Defendant again says "I can't help you out man." Agent Jester is then heard telling the Defendant that he is not allowed to make any promises to the Defendant or tell him what kind of prison time he is going to get because that is not within the agents' hands. He does tell the Defendant that from his own experience as a law enforcement officer, that people who cooperate have it a whole lot better than people who do not.

-        Detective Gerwan brings up the 10/20/Life law in the State of Florida.

-        Agent Jester tells the Defendant that the case could be taken federal or prosecuted by the state authorities. He mentions to the Defendant that in federal sentences there is no gain time and that you

30

serve day-for-day on a federal sentence.

-       Agent Jester discusses with the Defendant that if the case is taken for federal prosecution there is "something called a Rule 35" for people who cooperate. Agent Jester is careful to tell the Defendant that he is not saying that they can get that or any of that "stuff for him" under Rule 35. He was just "throwing out possibilities" to the Defendant.

-       Agent Jester mentions that the robberies are getting progressively more violent and suggested that the Defendant would not want to know that he could have done something to stop the robberies by cooperating and providing information about who may still be committing the robberies.

-       The Defendant asks if he is looking at any particular length of time and mentions 20 or 40 years. Agent Jester responds that he does not know and that is going to be up to the Defendant based upon what, if any, cooperation he gives. Further, Agent Jester tells the Defendant he cannot tell him any exact years for a prison sentence and that he does not know what the attorney is going to do. Agent Jester does say that based upon his experience working in Florida, that people who cooperate "get it better" than people who do not.

-       Agent Jester tells the Defendant that he does not know what he would be charged with or how many robberies he would be charged with. Again Agent Jester mentions that if somebody cooperates, that it is better than people who do not cooperate.

-       The Defendant again asks if he is looking at "a guaranteed 20" meaning years in prison. Once again, Agent Jester says that he does not

know what the prison time is going to be and that it depends on what the Defendant is charged with.

-       Once again the Defendant asks if "yes or no 20?" Agent Jester once again says that he does not know and is being honest when he tells him that he cannot tell him what length of sentence he is looking at. Detective Gerwan says that he would promise that if the Defendant cooperates, that Detective Gerwan would vouch for him in front of a Judge or a Magistrate to confirm that the Defendant had cooperated. Again, Agent Jester is heard telling the Defendant that he cannot give him a number because he is not the attorney who is prosecuting the matter.

-       The Defendant again mentions all of this being a bombshell. He asks if there are any deals available. Agent Jester responds by telling him that they are not allowed to do that as law enforcement officers and that the only people who can make deals are the attorneys. Further, he tells the Defendant that it has not even been decided yet if the case is going to be prosecuted in the federal or state system. He does emphasize again that the people who cooperate get deals and the better end of the situation based upon his experience as a law enforcement officer.

-       The Defendant refers to the information being provided to the officers as "basically circumstantial evidence and you guys have no gun." This re-emphasizes one of the comments made by the Defendant that he was, in fact, a lot smarter than he was letting on to the agents.

-       Detective Gerwan mentions to the Defendant that they realize the Defendant is wanting "a number for years in prison", but they cannot do that because it is not within their authority as police officers.

\-      Agent Jester then tells the Defendant that he is not going to promise him any particular sentence because they honestly do not know. Detective Gerwan again says that he would vouch for the Defendant if he does cooperate.

\-      Agent Jester discusses Rule 35 again and explains that if the motion is granted, it reduces the sentence by a substantial portion for people who cooperate. However, Agent Jester is clear to mention to the Defendant that "it is strictly up to the Judge" to decide whether or not to grant a Rule 35 motion.

\-      The Defendant asks if he cooperates does he go back to Florida. Agent Jester tells him yes, either after he finished his time in the Pennsylvania prison system or otherwise. Agent Jester tells the Defendant that if he cooperated maybe some of his time in Pennsylvania could count against any sentence he received in Florida. However, Agent Jester makes sure that the Defendant understands that Agent Jester cannot say how his sentence is going to work or whether it would be concurrent with his Pennsylvania sentence.

\-      It is about this time that the first break takes place. After going back on the record, the Defendant confirms that no threats or promises were made to him while they were off the record.

\-      The Defendant continues to appear to be concerned about his fiancee Amber. Agent Jester tells the Defendant that he has no desire to put Amber in jail at all and reaffirms that Amber has cooperated with them already. It is about this time that a second break was taken. It was during this time as mentioned above that Detective Gerwan purchased a soda and some potato

chips for the Defendant. After going back on the record, Agent Jester again has the Defendant affirm that no promises or threats were made while they were off the record.

-        The Defendant tells the agents that he hopes "the Feds pick up the case." Detective Gerwan tells the Defendant that it is not a guarantee, but it is looking good. Agent Jester says it is very likely. This is at or about the time when the January 14, 2009 statement ends.

107. In respect to the May 1, 2009 statement, there is no recording of that statement. The substance of this statement is contained within the three page report prepared by Agent Jester which was admitted as Defendant's Exhibit No. 2 at the hearing. This Court's review of the statement confirms the testimony of Agent Jester as to the Defendant being read his Miranda rights and the Defendant having waived those rights after saying he understood them completely. A review of the statement and its substantive contents concerning the robberies is not relevant to the issues raised in the Motion To Suppress. This is the same as in respect to the January 14, 2009 statement, since the substance of what the Defendant said concerning the robberies is not germane to the issues raised concerning the Defendant's challenge of the admissibility of either statement.

108. A review of the three page report concerning the May 1, 2009 statement confirms that it was taken at the Palm Beach County Jail interview room with Agent Jester, AUSA Talwar and AUSA Lineberger present along with the Defendant. Aside from the details concerning the questions asked and answers given concerning the robberies which are charged in this case, it appears on paper to be a relaxed atmosphere in which there is a give-and-take among the parties and the Defendant. There does not appear to be any

threats, intimidation or other coercive tactics by Agent Jester or the two Assistant United States Attorneys present.

109. This Court finds the need to complete the picture concerning the documents issued by this Court to secure the Defendant's appearance in this District. As reflected in Government's Exhibit No. 6, there was a Writ Of Habeas Corpus Ad Prosequendum issued by the undersigned United States Magistrate Judge on March 17, 2009 directing that the Warden of the Mercer State Regional Correctional Facility in Mercer, Pennsylvania, provide the Defendant to the United States Marshal's Service for transportation to this District for further proceedings in this matter. This Writ was issued by the Court pursuant to the Petition For Writ Of Habeas Corpus [D.E. #19] filed by the government on March 17, 2009.

110. DUSM Pickering testified that it was determined at some point that the Defendant was not going to be able to make his initial appearance hearing by April 23, 2009 at 9:30 a.m. at the U. S. Courthouse, 300 South Sixth Street, Fort Pierce, Florida, as set forth in this Court's Writ Of Habeas Corpus Ad Prosequendum [D.E. #20]. The government then filed a Motion To Continue Defendant's Initial Appearance [D.E. #80]. The motion states that on April 17, 2009, the government was informed that the USMS would be unable to produce the Defendant for his scheduled initial appearance on April 23, 2009 and requested that the Defendant's initial appearance be re-set for May 6, 2009. This Court entered an Order [D.E. #82] granting that Motion To Continue and re-set the Defendant's initial appearance for Wednesday, May 6, 2009 at 9:30 a.m., at the United States District Courthouse, 300 South Sixth Street, Fort Pierce, Florida. One final matter which is contained within the court file is the Arrest Warrant issued by this Court which indicates that it was executed and the Defendant arrested by the USMS in the Southern District of Florida on April 28, 2009, and is signed by DUSM Pickering.

111.    This concludes all of the evidence this Court will consider in regards to this motion Court and will now conduct an analysis of the evidence as it applies to the case law governing the issues raised by the Defendant's motion.

## ANALYSIS

112.    The Motion To Suppress seeks suppression of both the January 14, 2009 statement and the May 1, 2009 statement as being involuntary statements and the products of express promises of leniency. In addition, the motion asserts that the May 1, 2009 statement is also a violation of the Defendant's right to be brought before a United States Magistrate Judge without unreasonable delay.

113.    The law governing admissibility of the Defendant's statements of January 14, 2009 and May 1, 2009 applies equally to each statement. This Court will review the law in general concerning the determination of voluntariness of a confession/statement and the law relating to its admissibility. This Court will then briefly summarize the application of the particular facts separately in respect to each statement under a separate heading. Finally, this Court will discuss the law applicable to the Defendant's claim that the Defendant's statement made to the government on May 1, 2009 was in violation of the Defendant's right to be brought before a United States Magistrate Judge without unreasonable delay. That issue is separate and apart from the Miranda issues which relate to the January 14, 2009 statement and the May 1, 2009 statement.

114.    Determining the admissibility of any custodial confession or statement requires a two part inquiry. First the Court must decide whether the law enforcement officers complied with the requirements of Miranda. If they did, then the Court must determine whether the statement was voluntarily given. United States v. Jones, 32 F.3d 1512 (11th Cir. 1994). In making this determination concerning compliance with Miranda,

the Court can look to the written waiver and/or any oral waivers made by the Defendant in respect to whether or not he was properly advised of his constitutional rights, waived those rights and agreed to make a statement. The voluntariness depends upon the totality of the circumstances surrounding the giving of the statement. The Court must determine whether or not the statement was a product of the Defendant's free will and rational choice.

115.    The due process test for evaluating the voluntariness of the Defendant's confession examines whether or not the Defendant's will was overcome by the circumstances surrounding the statement.   The fact that the government may have complied with the requirements of the Miranda decision does not dispense with the required due process analysis to determine whether or not the confession/statement was voluntarily given. Dickerson v. United States, 120 S.Ct. 2326 (2000).

116.    The Court must determine whether or not there was any improper influence effect or coercion exerted by the officers upon the Defendant. Government coercion is a necessary predicate to any finding of involuntariness under the Fifth Amendment due process analysis. United States v. Thompson, 422 F.3d 1285 (11th Cir. 2005).

117.    The Court should consider the Defendant's education, his comprehension of his constitutional rights, his comprehension of the criminal charges about which he is being interviewed, whether the interview by law enforcement officers was excessively long in duration, whether the Defendant was deprived of food/medicine or subjected to threats of physical harm. These are suggested factors the Court should look to and are not, in and of themselves, an exclusive list of what circumstances may or may not affect the voluntariness of the confession. They are simply  examples of the atmosphere and surrounding circumstances the Court should look to in determining whether or not there was any coercive activity on behalf of the government and whether any such factor affected the Defendant's ability to freely waive his constitutional rights.

118. There is no bright line test for determining admissibility of a statement. Even if a suspect has a low IQ or other mental deficiency, those factors, in and of themselves, would not be sufficient to establish that the suspect's statements were involuntarily made. Once again, the Court must look to the totality of the circumstances to make sure that the suspect clearly understood the questions being propounded to him and calmly and appropriately responded. United States v. Gaines, 987 F.Supp. 1432 (S.D. Fla. 1997). See also United States v. Paredes, 139 F.3d 840 (11th Cir. 1998).

119. Testimony from an agent that he advised a suspect of his Miranda rights from a card carried by that officer and used routinely by him in advising defendants of their constitutional rights may be deemed sufficient if the officer testifies that he read all of the rights listed on the card and that the defendant indicated that he understood those rights and agreed to waive those rights before making any subsequent statement. United States v. Wright, 2008 WL 4874446 (11th Cir. 2008). In Wright, the Eleventh Circuit found that an accused effectively waives his Miranda rights if he: (1) voluntarily relinquishes them as the product of a free and deliberate choice, rather than through intimidation, coercion or deception; and (2) makes his decision with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. Such a waiver is effective where the totality of the circumstances reveal both an uncoerced choice and a requisite level of comprehension.

120. In another case, law enforcement officers told a suspect that if he cooperated and if he provided information it would not hurt him. The Eleventh Circuit found this to not be coercive activity. Even when the officers went further and told a suspect that cooperation might even help him, the Court found this to not be coercive activity requiring suppression of any statement made in response thereto. United States v. Graham, 2009 WL 1040133 (11th Cir. 2009).

121. Another case in which the Eleventh Circuit found the activity of the law enforcement officers to not be coercive involved officers threatening to arrest a suspect's mother and sister where there was legitimate probable cause to arrest them for crimes being investigated at the time that the defendant made his post-arrest statement. United States v. Estelan, 156 Fed. Appx. 185 (11th Cir. 2005). The Eleventh Circuit has also found that an officer's statement to a defendant that his girlfriend might face the electric chair if the defendant did not confess to committing a murder, did not render the defendant's post-arrest statement involuntary since the girlfriend had voluntarily implicated herself in the murder prior to the defendant's arrest. Thompson v. Haley, 255 F.3d 1292 (11th Cir. 2001).

122. A statement made by a law enforcement officer to a suspect that the suspect's cooperation would be passed on to judicial authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary. Telling a suspect that the government could possibly do "many things" on the underlying charges did not render any such incriminating statement involuntary either in light of the fact that the officers made it clear to the suspect that no specific promises could be made. United States v. Chealy, 185 Fed. Appx. 928 (11th Cir. 2006).

123. The Court next examines whether or not any of the statements made by the Defendant Ragland in this case during either interview were an indication that he wished to stop speaking. A suspect's statements that he was "not a snitch" and did not believe in providing information regarding other individuals were not sufficiently unambiguous invocations of his Fifth Amendment right to remain silent where that suspect had waived his Miranda rights prior to making the statements and his reluctance to provide

information concerning other individuals did not evince a clear desire to cease questioning. United States v. Del Rio, 168 Fed. Appx. 923 (11th Cir. 2006).

124.    A suspect's refusal to answer certain questions is not tantamount to an invocation, whether equivocal or unequivocal, of his constitutional rights to remain silent. Questioning may continue until a suspect articulates in some manner that he wishes the questioning to cease.  If a suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him. The suspect must articulate his desire to end questioning with sufficient clarity so that a reasonable police officer would understand that statement to be an assertion of the right to remain silent.  United States v. Mikell, 102 F.3d 470 (11th Cir. 1996). For example, in a situation where a defendant tells a law enforcement officer that at this time he had nothing further to say, did not unequivocally invoke his right to remain silent.  The court found that this was an ambiguous statement indicating that at that time the Defendant was not going to say anything further.  The court held that the officer did not have to stop questioning the defendant.  United States v. Alameda, 2007 WL 2819520 (S.D. Fla. 2007).  See also United States v. Thomas, 176 Fed. Appx. 997 (11th Cir. 2006).

125.    The determination of whether or not a suspect has actually invoked his right to counsel is an objective inquiry based upon the particular facts and surrounding circumstances. The suspect must articulate his desire to have counsel present sufficiently clear that a reasonable officer in such circumstances would understand the statement to be a request for counsel.  Officers are not required to clarify ambiguous or equivocal statements. For example, where a suspect says "maybe I should talk to a lawyer," it was held to not be a specific request for counsel. The agents in that situation were not required to stop questioning the suspect.  Davis v. United States, 114 S.Ct. 2350 (1994).  See also United States v. Racca, 255 Fed. Appx. 367 (11th Cir. 2007).

126.   In respect to the Defendant's Sixth Amendment right to counsel, a defendant's initial appearance before a Magistrate Judge marks the initiation of adversary proceedings which trigger attachment of his Sixth Amendment right to counsel. Thereafter, the defendant has a right to have counsel present at all "critical" stages of the criminal proceedings.   Montejo v. Louisiana, 129 S.Ct. 2079 (2009) and Rothgery v. Gillespie County, Texas, 128 S.Ct. 2578 (2008).  This Court mentions this only in respect to the Defendant's Sixth Amendment right to counsel once adversary proceedings are begun and to clarify when this Court understands such proceedings to begin.  This does not supplant the Defendant's right to have counsel present at any time during questioning before the initiation of adversary proceedings.  His right to counsel during any questioning is governed by the Miranda decision and the case law interpreting those situations as referenced above.  This Court only mentions this Sixth Amendment issue in respect to the Defendant's objection to not have counsel appointed until his initial appearance before this Court on May 6, 2009.  The Defendant did not have a constitutional right to appointment of counsel prior to his initial appearance other than his right to invoke his right to remain silent and/or request counsel at the time he was being questioned. Ther Defendant Ragland never exercised his constitutional rights in this regard as will be shown later herein.

### Analysis of January 14, 2009 Statement from the Defendant

127.   This Court finds that the atmosphere surrounding the Defendant's statement to law enforcement on January 14, 2009 at the Mercer State Correctional Institution in Pennsylvania was not coercive in any way.  This Court finds that sufficient breaks were taken during the statement. The Defendant was not threatened in any way.  In fact, at two different times when the recorder was turned off, the Defendant confirmed that there were

41

no threats or promises made to him during any breaks when the tape recorder was turned off.

128.    There is no indication that the agents threatened to charge any family members. In fact, the agents made it clear that the Defendant's fiancee had already cooperated with them and that they were not going to charge her with any crimes involving these robberies.

129.    The January 14, 2009 statement was taken during the daytime hours and not during a period of time when the Defendant would normally be sleeping.  Based upon the audio CD and the transcript, this Court finds that there was no badgering by the agents in questioning the Defendant.

130.    The record reflects that the Defendant is intelligent. It is clear that he understood the charges about which he was being questioned and where those charges were pending.  The Defendant has some college education and was articulate.    The atmosphere was calm during the interview.  The Defendant was read his Miranda rights and this was confirmed  on the record.  Further, the Defendant executed the Miranda waiver form which has been admitted into evidence in this case.

131.    The discussions between the agents and the Defendant concerning any prison time or charges that he may face are found by this Court to not have been coercive. Each time when the Defendant made specific inquiries concerning years he may be facing in prison, the agents made it clear to the Defendant that they could not make any promises concerning the charges, the amount of prison time or even which agency would be prosecuting him.  The agents did make it clear that if he cooperated, that they would make that  fact known to any Judge or Magistrate involved in his case.  The agents also made it clear to the Defendant that persons who cooperated usually received a benefit as a result of their cooperation.

132.    It is clear from the record that at no time did the Defendant unequivocally state that he did not wish to speak further. At no time during the interview on January 14, 2009 did the Defendant unequivocally request counsel to be present during the interview. When the Defendant stated on several occasions that the agents were "dropping a bomb" on him, he was not unequivocally invoking his right to remain silent. Likewise, when the Defendant is heard saying that he had no information and/or could not help the agents with their investigation, he was not unequivocally exercising his right to remain silent.

133.    This Court finds that in respect to the January 14, 2009 statement, the Defendant was properly advised of his Miranda rights, understood those rights, and freely and voluntarily waived those rights in agreeing to speak with the agents. The totality of the circumstances and atmosphere surrounding the statement were non-coercive. This Court finds that there is no evidence of any threats, promises of leniency, intimidation or other coercive tactics by either of the agents which would cause the Defendant's statements to have been made involuntarily. Further, at no time did the Defendant unequivocally invoke his right to remain silent and/or request counsel to be present. Therefore, this Court finds that the January 14, 2009 statement meets the requirements of the case law recited above. This Court finds that the statement was made voluntarily and is admissible.

## Analysis of May 1, 2009 Statement from the Defendant

134.    There is no tape recording or transcript of this statement. This Court is relying upon the exhibit admitted into evidence which is Agent Jester's three page report reflecting the substance of the Defendant's statement on May 1, 2009, as well as the testimony from Agent Jester and the Defendant Ragland. Agent Jester testified that during the May 1, 2009 statement, the Defendant again asked as to specific prison time he may receive. Agent Jester once again told the Defendant that he could not give him any

43

specific answers about that. Agent Jester also testified that he had read the Defendant his Miranda rights from a card that he regularly carries to advise suspects of their constitutional rights. He read from that same card into the record. The rights he read into the record do appear to comply with the required Miranda warnings. Additionally, Agent Jester testified that the Defendant understood his rights, voluntarily waived those rights and agreed to speak with him and the Assistant United States Attorneys present.

135.    The Defendant testified that while alone with Agent Jester on May 1, 2009, that Agent Jester told him that the Defendant could help himself and promised him leniency. He testified that the two Assistant United States Attorneys then came back into the room. However, the Defendant then testified and agreed that no promises or specific number of years in prison were mentioned by anyone during the May 1, 2009 interview. He further admitted during his testimony that he was told that if he cooperated he could help himself, which this Court finds perfectly permissible under the applicable case law cited above.

136.    The Defendant understood that Agent Jester was there to ask about some further facts in respect to these robberies which had occurred in Florida. The Defendant has some college education and at no time appeared to not understand what was happening. When asked whether or not the Defendant understood his rights and waived them, the Defendant's testimony was equivocal in this Court's view. At one point the Defendant said that he "might have said" that he understood his rights and then later testified that he was "in a state of confusion" and did not waive his rights. This Court finds that the Defendant's inconsistent testimony and his demeanor on the stand weighs against his credibility. As a basis for this finding, this Court observed that at any point during the Defendant's testimony when it appears as though he may be giving an inconsistent answer, he returned to his "state of confusion" statement as a reason for not recalling

something. However, if the Defendant was ever going to be in a state of confusion, it would have been when he was initially confronted by the agents in the Mercer State Correctional Institution in Pennsylvania, that being the first time that he had been confronted with any evidence by law enforcement officers concerning the Florida robberies. During the May 1, 2009 statement, the Defendant already knew Agent Jester and grinned when he initially came in the room. He knew Agent Jester was probably there to discuss the Florida robberies if the Defendant agreed to speak with him. This Court does not believe the Defendant's assertion that he was in a "state of confusion" at all times during the May 1, 2009 interview to such an extent that he was unable to understand his constitutional rights and knowingly waive those rights.

137. This Court finds that a review of the statement admitted into evidence as contained within Agent Jester's three page report, does not reflect any confusion on the part of the Defendant nor any coercive tactics on behalf of Agent Jester, AUSA Talwar or AUSA Lineberger. There is no evidence in the record that there were any threats or coercive statements made during the May 1, 2009 interview such as would make his subsequent statement involuntary. The only thing that the Defendant offers is his statement that he was "in a state of confusion."

138. As referenced above, this Court finds that Agent Jester did properly advise the Defendant of his Miranda rights. This Court accepts the testimony of Agent Jester that the Defendant understood those rights, waived them and agreed to make a statement on May 1, 2009 to Agent Jester and the Assistant United States Attorneys present. This Court finds that the Defendant's subsequent statement was voluntary. This finding is based upon all of the surrounding circumstances as testified to by Agent Jester and upon this Court's review of the Defendant's testimony at the hearing. This Court finds the Defendant's testimony not credible in this regard as noted above. As a result, this Court finds that the

45

Defendant's May 1, 2009 statement is admissible insofar as it meets the requirements of Miranda and the due process analysis as required under the applicable case law cited above.

139.   This Court will now review the circumstances surrounding the Defendant's transfer into this District prior to the May 1, 2009 statement as it relates to the Defendant's argument that he was deprived of his due process rights in not being brought before the United States Magistrate Judge for his initial appearance prior to May 6, 2009.

**Defendant's Due Process Argument That His May 1, 2009 Statement Be Suppressed Due To The Failure Of The Government To Present Him Before A United States Magistrate Judge For An Initial Appearance Prior To May 6, 2009**

140.   The final argument made by the Defendant concerning the May 1, 2009 statement is a constitutional due process argument.   The Defendant argues that he should have been brought before a United States Magistrate Judge for his initial appearance prior to May 6, 2009.   To put this in proper perspective, this Court will set forth the timeline from the evidence received and the testimony of DUSM Pickering and the Defendant.

a.   April 8, 2009: Defendant taken into custody by USMS and brought to federal holding facility in Pittsburgh, Pennsylvania.   He was thereafter taken to a federal facility in Youngstown, Ohio and remained there until April 14, 2009.

b.   April 14, 2009:  Defendant flown from Ohio and flown to Oklahoma City federal holding facility hub that same day.

c.   April 14-28, 2009:  Defendant held at the Oklahoma City facility.

d.   April 28, 2009:   Defendant flown from Oklahoma City holding facility to Miami.

e.   April 29, 2009:   Defendant taken from Miami to Palm Beach County Jail.

f.   May 5, 2009:  Defendant taken to St. Lucie County Jail.

g.      May 6, 2009:  Defendant's initial appearance before this Court.

141.    The Defendant's transfer was pursuant to a Writ Of Habeas Corpus Ad Prosequendum which is treated differently from the Defendant being taken into custody under a warrant on complaint or an arrest without a warrant.  Transfer of the Defendant pursuant to such a Writ is also treated differently than a transfer pursuant to a detainer and extradition.  The Defendant was a state prisoner serving a sentence in the State of Pennsylvania at the time this Court issued its Writ directing that the Defendant be immediately turned over to the federal authorities for transfer to this District.  A transfer pursuant to a Writ Of Habeas Corpus Ad Prosequendum is not subject to the provisions of the Federal Rules of Criminal Procedure whether they be Rule 40 concerning removal or Rule 5(a) regarding initial appearance.  Dawn v. United States, 12 F.3d 1100 (7th Cir. 1993)(cert. denied, 117 S.Ct. 321 (1996)).  See also United States v. Mauro, 436 U.S. 340 (1978) and United States v. Sawyers, 963 F.2d 157 (8th Cir. 1992).

142.    The fact that the Defendant was transferred pursuant to a Writ does not preclude the Defendant raising the argument of "unreasonable delay."  However, this Court finds that the overwhelming evidence in this case weighs against any showing that there was a deliberate, unreasonable delay in regards to the Defendant's transfer to this District.

143.    The testimony and evidence in this case suggests that the first date the Defendant was available to be taken into federal custody from the State of Pennsylvania was April 8, 2009 and no sooner.  He was taken into federal custody and removed to a federal holding facility in Pittsburgh that same date.  He was then transferred to another federal facility in Youngstown, Ohio.  While there is no evidence one way or the other as to why that transfer was made, there is no evidence that it was made for any ulterior purpose or to further delay the Defendant's transfer into this District.  The Defendant was then taken from the Ohio facility and flown by USMS airlift to the Oklahoma City holding

47

facility which DUSM Pickering testified is the main hub through which all federal prisoners are transported.

144.   DUSM Pickering testified that he knows that there were no flights available from Oklahoma City to the Southern District of Florida from April 14, 2009, being the date the Defendant was transferred to the Oklahoma City facility, to April 28, 2009 when the Defendant was actually put on a flight to this District.  Further, DUSM Pickering testified that flights are not booked and scheduled for prisoners until such time as they are taken into federal custody.  Therefore, the flights for the Defendant to get to the Southern District of Florida would not have been arranged and booked until after he was taken into federal custody on or about April 8, 2009.

145.   DUSM Pickering testified that the first available flight to the Southern District of Florida from the Oklahoma City facility was on April 28, 2009 when the Defendant was flown directly to Miami, Florida.   DUSM Pickering also testified that there are no commercial flights or other direct flights utilized by the USMS airlift to transport persons in federal custody. He testified such transportation is done in accordance with the schedule of flights available to the United States Marshal's Service.  DUSM Pickering testified that over 350,000 prisoners are transported throughout the country on an annual basis.

146.   By the time the Defendant arrived in this District on April 28, 2009, his initial appearance had already been continued by this Court to May 6, 2009. This Court's Order specifically directed it was to be held in the Fort Pierce Division where this case is pending. When asked on cross-examination as to why the Defendant was not brought before a Magistrate Judge in Miami upon his arrival, DUSM Pickering testified that it was because this Court had already entered an Order directing his initial appearance to be in the Fort Pierce Division on May 6, 2009.

147. When asked about the continuance of the original initial appearance hearing set for April 23, 2009, DUSM Pickering testified that once he was notified by the transport division of the USMS that the Defendant would not be able to be flown into this District in time for his initial appearance, DUSM Pickering advised the United States Attorney's Office. It was at or about that same time that the Motion To Continue Defendant's Initial Appearance was filed and this Court entered the Order continuing that initial appearance.

148. The Defendant was then transported from Miami to the Palm Beach County Jail as an interim step to getting the Defendant to the Fort Pierce Division. While it may have been better practice for the agent and representatives of the United States Attorney's Office to not attempt to interview the Defendant prior to his scheduled initial appearance, this Court cannot find any legal impediment to their doing so. In this respect, this Court has reviewed Justice Souter's opinion in Corley v. United States, 129 S.Ct. 1558 (2009) in which the Supreme Court held that the attempt by Congress in enacting 18 U.S.C. §3501 to codify Miranda and admissibility of statements was meant to limit the so-called McNabb-Mallory presentment exclusory rule and not to eliminate it.

149. Under Corley's interpretation of the McNabb-Mallory presentment exclusionary rule, a person taken into custody pursuant to an arrest on a complaint or an arrest without a warrant must be presented without unnecessary delay before a Magistrate Judge. McNabb-Mallory which has been qualified by 18 U.S.C. §3501 and the Corley decision found inadmissible confessions that were given in violation of that interpretation of the presentment rule.

150. 18 U.S.C. §3501 attempted to codify the determination of the voluntariness of a confession and thereby modify the Supreme Court's ruling in Miranda and its progeny. The Corley decision specifically states that the statute enacted by Congress did not eliminate the McNabb-Mallory analysis, but only meant to limit the application concerning

49

when a judge should find overreaching on behalf of the government requiring the suppression of a post-arrest statement. However, as stated by this Court herein, Corley does not appear to be applicable to this case involving the Defendant Ragland who was transferred into this District pursuant to a Writ. Corley appears to concern itself, as did McNabb and Mallory, with the application of Federal Rules of Criminal Procedure 5(a) governing the presentment of an individual for an initial appearance based upon an arrest within a district and does not deal with the taking into custody of a state prisoner from a foreign jurisdiction pursuant to a Writ Of Habeas Corpus Ad Prosequendum.

151.   As mentioned above, the case law which this Court finds to still be valid excludes from the application of the Federal Rules of Criminal Procedure relating to initial appearances and removals, the transfer of a state prisoner into federal custody pursuant to a Writ Of Habeas Corpus Ad Prosequendum. This exclusion from the application Interstate Agreement On Detainers Act as well as the provisions of the Federal Rules of Criminal Procedure, would strongly suggests to this Court that 18 U.S.C. §3501 as well as the Supreme Court's decision in Corley is inapplicable to this situation in this case involving the Defendant Ragland. See also Phillips v. Jarrell, 281 Fed. Appx. 885 (11th Cir. 2008) and United States v. Beard, 41 F.3d 1486 (11th Cir. 1995), (which reflect that defendants' rights in regards to speedy trial are handled much differently in respect to a transfer into federal custody pursuant to a Writ Of Habeas Corpus Ad Prosequendum as opposed to a detainer).

152.   Other than the inference and suggestion by the Defendant that the delay in his transfer into this District was purposeful and intended to allow the government to delay his appearance before a Magistrate Judge, there is no evidence to support such a conclusion. This Court has already set forth its findings herein that prior to the May 1, 2009 statement from the Defendant, he was duly advised of his Miranda rights, understood

those rights, waived them and agreed to speak with Agent Jester and the Assistant United States Attorneys present at the Palm Beach County Jail. Further, this Court's findings are that the circumstances surrounding the taking of that statement do not appear to have in any way affected the Defendant's ability to waive those rights and voluntarily make any statement to Agent Jester and the AUSAs present pursuant to the questions which were asked and the answers given on that date.

153.    This Court finds no evidence of any ulterior motive nor any evidence that the Defendant was delayed in being brought before this Court for his initial appearance for the purpose of extracting further evidence from him. DUSM Pickering established that the delay in getting the Defendant transferred to this District was not unreasonable in light of all facts and the schedule of USMS airlift flights. Normal procedures of the USMS were followed in transporting the Defendant to this District. Before the Defendant arrived in this District, the Court had already reset his initial appearance for May 6, 2009 pursuant to an Order granting the government's Motion To Continue. The arrest warrant was executed on April 28, 2009 when the Defendant arrived in this District. It is perfectly reasonable for the government to believe that it was not necessary to bring the Defendant before the Court at any earlier date.

154.    Finally, this Court finds that there is no evidence to support a conclusion that the government's Motion To Continue Defendant's Initial Appearance from April 23, 2009 to May 6, 2009 was made for any ulterior purpose. The evidence before this Court is that the request for the continuance initially came through DUSM Pickering when he was advised by the transport arm of the USMS that the Defendant would not be able to be flown into this District in time for his April 23, 2009 initial appearance. This information was then passed along to the United States Attorney's Office, which then filed the Motion To Continue. This Court finds no evidence of a conspiracy or intentional misleading of the

Court to continue the initial appearance so that the Defendant could be questioned prior to his being brought before the undersigned United States Magistrate Judge. This Court's conclusion would have been markedly different in the absence of the case law cited by this Court which holds that the transfer of a defendant pursuant to a Writ Of Habeas Corpus Ad Prosequendum is not governed by the Federal Rules of Criminal Procedure relating to a defendant's initial appearance and removal.

**ACCORDINGLY**, this Court recommends to the District Court that the Defendant's Motion To Suppress Statements Dated January 14, 2009 and May 1, 2009 [D.E. #186] be **DENIED.**

The parties shall have ten (10) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable K. Michael Moore, United States District Judge assigned to this case.

**DONE AND SUBMITTED** this ⧸⧸⧸ day of July, 2009, at Ft. Pierce, Northern Division of the Southern District of Florida.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

Copies furnished:
Hon. K. Michael Moore
AUSA Rinku Talwar
Peter T. Patanzo, Esq.